FRANK A. KLEPETKO, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent
Klepetko v. Commissioner
Docket No. 23973-88
United States Tax Court
T.C. Memo 1990-644; 1990 Tax Ct. Memo LEXIS 721; 60 T.C.M. (CCH) 1489; T.C.M. (RIA) 90644; December 26, 1990, Filed *721 Decision will be entered for the respondent. Lawrence Klepetko, for the petitioner. Mark L. Hulse, for the respondent. COLVIN, Judge. COLVIN
*2133 MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined a $ 26,660 deficiency in petitioner's Federal income tax for 1981. After concessions by petitioner, the remaining issues to be decided are: 1. Whether petitioner may deduct in 1981 the $ 38,958 he invested in TOPCO (a) as a loss from section 1244 stock, (b) as a bad debt under section 166, (c) as a business or investment expense under sections 162 or 212, or (d) as a loss under section 165. We hold that he may not. 2. Whether petitioner may deduct $ 2,500 paid to Jerry Johnson as a bad debt, or as an expense under sections 162 or 212. We hold that he may not. 3. Whether petitioner *724 may deduct $ 4,464 in traveling expenses under sections 162 or 212. We hold that he may not. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for 1981, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioner
Petitioner resided in New York, New York, when he filed his petition. In 1974 he received a Master of Business Administration degree from the University of Chicago with a concentration in accounting. From 1974 through 1981 he worked in the corporate finance departments of various large securities firms. During 1981, the year in issue, he was employed full-time as a vice president at Blyth Eastman Paine Webber, Inc. (Paine Webber). All of his wages and earned income in 1981 were from Paine Webber. Petitioner's duties were to assist his employer's clients with capital formation. Much of his work resulted from referrals and personal contacts. It is possible that efforts made to cultivate such contacts may pay off many years later. Petitioner timely filed his 1981 Federal individual income *725 tax return. He did not file a Schedule C or report any business income or loss on his return. Three deductions claimed by petitioner and disallowed by respondent remain in dispute. They are: first, petitioner claimed $ 38,958 as an ordinary loss with respect to the Tulsa Oilfield Pump Company (TOPCO) under section 1244; second, petitioner deducted $ 3,000 as a Schedule D nonbusiness bad debt, which he later conceded should have been $ 2,500; and third, petitioner deducted travel expenses in the amount of $ 4,464 from a trip to Australia. 2. KKG and TOPCO
The ordinary loss deduction of $ 38,958 arose from petitioner's investment of that amount in a partnership known as KKG, which in turn invested in TOPCO. KKG was formed by Van Kasper, Frank Klepetko (petitioner), and Dempsy Gable. Each was a one-third investor and a general partner in KKG. Once petitioner made his initial investment in TOPCO, he delegated the duties of monitoring TOPCO stock holdings to Gable. Decisions about all TOPCO expenses were left to Gable. *2134 KKG prepared at least four private placement memoranda during 1981 to raise venture capital for TOPCO. Petitioner tried to locate investors *726 for TOPCO. TOPCO was formed as an Oklahoma corporation on January 20, 1981, to develop and sell a hydraulic oil pump. TOPCO was authorized to issue 500 shares of common stock with a par value of one dollar. On January 22, 1981, the patent for the hydraulic pump was obtained by TOPCO from Econo Pump Corporation (Econo Pump) for one dollar and 250 shares of TOPCO stock. The document evidencing the agreement indicated that Jerry Johnson (Johnson) was to be vice president, assistant secretary, and assistant treasurer of TOPCO. KKG purchased the other 250 shares of TOPCO stock for $ 250 on January 22, 1981. Respondent treated that stock as section 1244 stock. Also on January 22, 1981, KKG lent TOPCO $ 99,750, payable with interest in equal installments on January 22, 1983, and January 22, 1984. The loan was evidenced by a promissory note and was secured by all TOPCO assets and proceeds thereof. The security agreement also provided remedies in the event of default. The loan was made to enable TOPCO to develop and market a hydraulically operated oil field pump. Thus, KKG supplied a total of $ 100,000 to TOPCO. It was to remain in escrow until it was determined whether KKG could *727 raise an additional $ 350,000. However, the escrow provision was waived and the $ 100,000 was provided to TOPCO. The $ 99,750 loan from KKG to TOPCO was not due or repaid in 1981. An undated handwritten note on the back of the promissory note states, "Obligation evidenced by this note is hereby contributed to the capital of its maker Tulsa Oilfield Pump Company. KKG Partnership by Dempsy L. Gable, Partner ." KKG did not attempt to collect on the loan, or avail itself of any of the remedies provided by the security agreement executed with the loan. Johnson was a key person in TOPCO's organization from its inception to its demise. He was instrumental in obtaining the hydraulic oil pump patents for TOPCO. Through Aimwell and Econo Pump, he had prior involvement with the hydraulic oil pump that TOPCO was attempting to commercialize. He was on TOPCO's board of directors throughout TOPCO's existence, and he attended almost every meeting of the TOPCO board of directors. He was one of a few people paid a salary by TOPCO. TOPCO paid him a monthly salary of $ 1,500 for April and May 1981 and $ 1,000 for June, July, and August 1981. In September 1981 his salary increased to *728 $ 3,000 per month. TOPCO granted Johnson certain rights to market the pump as well as other sales arrangements. Johnson was also TOPCO's principal marketing employee compensated by salary and incentive based on revenue. On April 7, 1981, a Nevada corporation named TOPCO was formed. In April, the original Oklahoma TOPCO was merged into it with the Nevada TOPCO surviving. On June 24, 1981, TOPCO, Johnson, and a New Mexico corporation named Hot Hole Instruments, Inc. (Hot Hole) entered into a five-year agreement to manufacture, market, and distribute the hydraulic oil pump for which TOPCO held the patent. Under the agreement TOPCO would receive 25 percent of the amounts Hot Hole received from the sale of hydraulic oil pumps. TOPCO had to develop a series of hydraulic oil pump prototypes to become commercially viable. It was important to get prototype pumps into the field so oil companies could see them work. Prototype hydraulic oil pumps were installed in New Mexico in late 1981. They were intended to be a combination test bed and revenue opportunity. No revenues were collected from the hydraulic oil pumps placed in New Mexico. Arrangements to build and market the pumps *729 did not move along very well, and TOPCO began running low on funds. KKG began a program to raise additional venture capital for TOPCO. Petitioner wrote three letters on Paine Webber stationary in late 1981 to seek investments for TOPCO. Petitioner issued two checks totaling $ 5,625 to purchase TOPCO stock as an individual. About 12 other investors also invested in TOPCO, providing it with about $ 50,000 of capital. TOPCO continued to own the hydraulic oil pump patent and to do business after 1981. During 1982, TOPCO worked with another enterprise which was responsible for collecting revenues for the hydraulic oil pumps installed during the end of 1981. After 1981, TOPCO looked at a number of other investments, had discussions with various people, and tried other approaches. In spite of its difficulties, TOPCO planned to regroup in some manner. TOPCO's Board of Directors held board meetings from January 25, 1981, through January 28, 1982. Gable sent and received correspondence for TOPCO during 1982. There is no evidence that any part of petitioner's investment was returned to him. Because petitioner was a one-third partner in KKG, which had provided $ 100,000 to TOPCO, *730 *2135 petitioner's claimed TOPCO loss is his $ 33,333 investment in KKG plus $ 5,625, for a total of $ 38,958. Respondent allowed $ 83 as an ordinary loss deduction under section 1244 by allocating to petitioner one-third of the $ 250 paid by KKG for TOPCO's common stock. On Form 4797 (Supplemental Schedule of Gains and Losses) of his 1981 return, petitioner claimed this amount as an ordinary loss from section 1244 stock, acquired in January 1981, and worthless as of December 1981. 3. $ 2,500 Payment to Jerry Johnson
Petitioner issued checks to Johnson for $ 1,000 and $ 1,500 on October 28, 1981, and December 14, 1981. Petitioner provided the money to improve the relationship that TOPCO had with Johnson and to help Johnson invest in TOPCO. There is no evidence that any part of the $ 2,500 was returned to petitioner. Petitioner claimed a Schedule D nonbusiness bad debt deduction of $ 3,000 on his 1981 income tax return. On his return petitioner indicated January through August 1981 as the date the debt was acquired and November 1981 as the date the debt became uncollectible. Petitioner concedes that the proper amount of the claimed deduction is $ 2,500. 4. *731 Australian Traveling Expenses
During 1981 petitioner traveled to Australia for approximately three weeks. The trip was requested and arranged by Tom Hopkins, a friend of petitioner, to involve petitioner in Hopkins' business dealings. Petitioner went to Australia to investigate several opportunities and to work with some contacts. One possible investment opportunity was in connection with a corporation called American/Australian Gold Corporation (AAGC). AAGC was formed to extract gold from Australian gold mine tailings. When he went on the trip, petitioner did not have any investments or own any real estate or rental property. Petitioner contemplated purchase of a major interest in AAGC. During his trip, petitioner had various meetings, visited mining properties, and visited an Australian Federal Reserve bank in Sydney. Petitioner did not travel to Australia at the request of his employer, Paine Webber. If petitioner had made a trip for Paine Webber, any expenses incurred by petitioner would have been reimbursed by Paine Webber. Later business deals may have resulted from the 1981 Australia trip. An example is that a small brokerage firm participated in a very minor *732 Paine Webber underwriting. OPINION 1. Deduction Under Section 1244 of Petitioner's Investment in TOPCO Through KKG Of petitioner's $ 33,333 investment in KKG deducted on his return, $ 33,250 remains in dispute ($ 33,333 less $ 83 allowed by respondent). He argues this deduction is available under one or more of sections 1244, 162, 165, 166, or 212. Petitioner asserts that KKG's payments to TOPCO were for section 1244 stock. Petitioner argues that the KKG loan to TOPCO was converted to stock that became worthless in 1981. Respondent concedes that TOPCO was a small business corporation under section 1244(c)(3). However, respondent contends that no stock was issued by TOPCO to KKG other than the original shares purchased for $ 250. Alternatively, respondent argues that any increase in KKG's investment in TOPCO was a contribution to TOPCO's capital. a. Worthlessness
Respondent argues that none of the sections cited by petitioner apply because the evidence shows the investment had value at the end of 1981. We agree with respondent. To deduct an ordinary loss under section 1244, petitioner must have sold or exchanged the stock at a loss, or the stock must have *733 become worthless. Section 1244(a); . A determination of worthlessness is "purely a question of fact." . Whether worthlessness occurs in a particular year is likewise a question of fact. ; . The burden is on the taxpayer to establish the fact that there was a deductible loss. . Petitioner's opinion that he would not receive any return on his equity is not sufficient to show that his loss occurred in 1981. . Worthlessness is determined by an objective rather than a subjective standard. . Several objective indicia of potential value exist in this case. First, TOPCO continued to do business after 1981. Continuing operation of a business is an indication that its stock is not worthless. ; ; *734 . In 1982 TOPCO board meetings were held, TOPCO officers were appointed, and revenues from hydraulic oil pumps installed in New Mexico were due. TOPCO continued to *2136 own the patent for the hydraulic oil pump beyond 1981. A loss for worthlessness of stock does not occur until there is no realistic chance of recovering any part of its value. See . We know of no attempt by petitioner to sell or otherwise establish a price or value in 1981 for his TOPCO stock, or any other TOPCO stock. Accordingly, we are not convinced that the TOPCO stock was worthless in 1981. b. Issuance of Stock to KKG Beyond the Original Shares Purchased for $ 250 Respondent contends that no stock was issued by TOPCO to KKG other than the original shares purchased for $ 250. We agree. There is no documentary evidence that KKG received any additional shares for the $ 99,750 loan, or that KKG purchased any other shares of TOPCO stock. TOPCO did not issue stock in place of the KKG loan. The only related documentary evidence is *735 Gable's undated handwritten note on the back of the promissory note stating that the loan was converted to capital. Thus, we do not find that petitioner's purported loss of $ 33,250 through KKG is from section 1244 stock. 2. Deduction Under Section 1244 of Petitioner's Payment of $ 5,625 to Purchase TOPCO Stock Petitioner paid $ 5,625 to purchase TOPCO stock in addition to his $ 33,333 investment in TOPCO through KKG. Petitioner claims a loss for this $ 5,625 amount under section 1244. One distinction between this and the KKG investment in TOPCO is that here stock was issued to petitioner. However, we are not convinced it was worthless at the end of 1981, and so we disallow petitioner's purported loss of $ 5,625 under section 1244. Petitioner also notes that respondent allowed an ordinary loss for 1981 under section 1244 for the initial $ 250 stock issue from TOPCO to KKG. Petitioner argues that it would be inconsistent to deny section 1244 loss treatment to his other TOPCO stock. However, regardless of respondent's treatment of the $ 250 of stock, the record here shows that petitioner is not entitled to section 1244 treatment for this loss because of lack of worthlessness *736 of the stock. We so hold. In light of the foregoing, we sustain respondent's disallowance of all of petitioner's claimed section 1244 stock losses beyond the $ 83 allowed by respondent. 3. Deduction Under Sections 162, 165, 166, or 212 for Petitioner's Investment in TOPCO Petitioner argues that his share of the $ 99,750 invested in TOPCO by KKG ($ 33,333), and his $ 5,625 direct investment in TOPCO, is deductible under one or more of sections 162, 165, 166, or 212. Petitioner argues that the losses are deductible because they were incurred through his trade or business of investment banking, or simply in his role as an investor. a. Deduction for Petitioner's Investment in TOPCO as a Trade or Business Expense Under Section 162 Petitioner asserts that his investment in KKG which later invested in TOPCO and his personal investment in TOPCO are deductible under section 162 as an ordinary and necessary expense incurred in his trade or business of investment banking. Section 162(a) provides for the deduction of all ordinary and necessary expenses paid while carrying on a trade or business. Petitioner asserts three theories for deduction of these payments as a trade *737 or business expense: first, that the expenses were incurred in connection with his investment banking employment with Paine Webber; second, that the expenses were incurred as part of his investment banking trade or business for TOPCO; and third, that petitioner was in the trade or business of producing and marketing hydraulic oil pumps. The Code does not contain an all-embracing definition of the term "trade or business." . It is clear, however, that not every income-producing activity constitutes a trade or business. ; . The test to determine if an activity is a trade or business or was undertaken and carried on for the production of income so that expenses may be deducted is whether the taxpayer's primary purpose for engaging in the activity is for income or profit. . As used in this context, "primary" means "of first importance" or "principally." . "Profit" *738 means economic profit, independent of tax savings. . Carrying on a trade or business comprehends continuity and regularity. See ; . We do not agree with petitioner's first theory because we do not find that his investment in *2137 KKG (or KKG's investment in TOPCO) was part of petitioner's trade or business with Paine Webber. ; ; cf. (deduction allowed for insider's profits repaid to corporation). No matter how extensive his activities may be, an investor is never considered to be in the trade or business with respect to his investment activities. ; , affd. per curiam . Petitioner's reliance upon , *739 is misplaced. In Milbank, the taxpayer was an investment banker who sold stock and debentures through his business in the promotion of a wallboard manufacturing plant. The venture ran into financial difficulties. He personally made payments on behalf of a corporation owned by himself and his brother to avoid a serious effect on his investment banking business. Under those facts, we found his payments to be deductible as ordinary and necessary business expenses approximately related to his investment banking business. . Here, we find petitioner's activities to be that of an investor, and not a part of his investment banking activities. His involvement in TOPCO was minimal, sporadic, and irregular. His primary function was that of a source of funds. He took no active part in management. We disagree with the second theory because we do not find that petitioner was an investment banker for TOPCO. Rather, he was an investor in a partnership that invested in TOPCO. Petitioner did not file a Schedule C or report any business income or loss on his 1981 Federal income tax return. Thus, we are not persuaded that petitioner *740 was an investment banker for TOPCO. We disagree with the third theory because we do not agree that petitioner was in the hydraulic oil pump business as a result of his TOPCO investments. b. Deduction for Losses on Petitioner's Investment in TOPCO Under Section 165.
Although petitioner refers to section 165 only generally, we presume he wishes to claim deductibility under (1) section 165 (c) (1), losses incurred in a trade or business; (2) section 165(c)(2), losses incurred in a transaction entered into for profit, though not connected with a trade or business; or (3) section 165(g), losses from a worthless security, which includes both stock and notes. Under section 165(c)(1), petitioner's loss must have been incurred in connection with a trade or business. As discussed above, his dealings with KKG and TOPCO are personal investment activities and not a trade or business. Thus, section 165(c)(1) does not apply. Moreover, under section 165(c)(1) or (2) the loss must occur in the taxable year at issue. As discussed above, we are not convinced that petitioner's TOPCO investment was worthless in 1981. We do not believe that any loss occurred in 1981. Accordingly, no deduction *741 under section 165(c)(1) or (2) is available. Under section 165(g)(1), the deduction for a worthless security may be taken only in the year the security becomes worthless. . As discussed above, we are not persuaded that the security became worthless in 1981. Accordingly, petitioner is not entitled to an ordinary loss deduction under section 165(g). c. Deduction for Petitioner's Investment in TOPCO Under Section 166 as a Bad Debt Petitioner alternatively argues that the $ 99,750 loan from KKG to TOPCO is deductible as a bad debt under section 166(a). Under section 166, a taxpayer other than a corporation may deduct losses from a debt created in connection with a trade or business when the debt becomes wholly or partially worthless. Section 166(a), (d). Petitioner asserts that the loan became worthless in 1981. He does not argue that the loan became partially worthless during the year at issue. A debt is worthless if the debtor has no assets of value nor the potential for any value. . Respondent contends that petitioner has failed to prove that the *742 $ 99,750 loan was worthless in 1981. For reasons previously discussed, we agree with respondent. Petitioner again relies upon , where the investment banker taxpayer was allowed to deduct a loan as a loss from a business debt. However, in that case there was no issue as to the worthlessness of the loan. Here, a central issue is worthlessness. Moreover, the loan in Milbank was directly related to the taxpayer's primary business as a partner in a Wall Street investment firm. Here, petitioner's TOPCO activities are not connected with his employment at Paine Webber. The promissory note at issue here was executed with a security agreement. The collateral included prototype pumps, royalties, and patents. There is no evidence that the security was worthless in 1981. Petitioner did not claim that *2138 any attempts were made to collect the debt. Accordingly, we do not find that the $ 99,750 loan was deductible as a bad debt in 1981. d. Deduction for Petitioner's Investment in TOPCO Under Section 212 as an Expense for the Production of Income Finally, petitioner argues that the loss from his investment in KKG, which *743 invested in TOPCO, is deductible under section 212 as an expense for the production of income. Section 212 provides: Sec. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year -- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.
Petitioner does not argue that section 212(2) or (3) applies here. We will consider his claim for deduction under section 212(1). The origin and character of a claim with respect to which an expense was incurred, as distinguished from the potential effect upon the financial fortunes of the taxpayer, determines whether an individual may deduct an expense under section 212. ; ; ; . *744 Petitioner's reliance on , affd. , is misplaced. In (Court reviewed), we overruled Hoopengarner. In light of the foregoing, petitioner has not persuaded us that he is entitled to an ordinary loss deduction for his dealings with KKG and TOPCO in the amount of $ 38,958. Accordingly, we sustain respondent's determination on that issue. 2. $ 2,500 Payment to Jerry Johnson
Petitioner issued a check to Johnson on October 28, 1981, for $ 1,000, and on December 14, 1981, for $ 1,500. Petitioner contends that the payments to Johnson are a loan. On Schedule D of his 1981 income tax return, petitioner claimed a nonbusiness bad debt deduction of $ 3,000. On the return, petitioner stated that the debt was acquired from January 1981 through August 1981 and that the debt became worthless in November 1981 when it became uncollectible. At trial, petitioner conceded that the proper amount to claim is $ 2,500. He argues that it is a nonbusiness or business bad debt and deductible under section 166. Petitioner *745 further argues that sections 162, 165, or 212 support the deduction. a. Nonbusiness Bad Debt
Petitioner must establish that the advances in question made to Johnson constitute a bona fide debt. , affd. per curiam ; , remanded . Petitioner presented no evidence that the payment to Johnson was a bona fide debt other than petitioner's testimony. There are no documents in the record supporting petitioner's loan theory. Accordingly, we hold that the $ 2,500 payment to Johnson is not a loan, and is not deductible as a nonbusiness bad debt. b. Business Bad Debt
Petitioner argues that the $ 2,500 amount is deductible as a business bad debt under section 166. As stated, petitioner has not proven a valid debt. Also, there is no indication if and when the debt became worthless. Accordingly, we reject petitioner's business bad debt theory. c. Section 162 Ordinary and Necessary Trade or Business Expense Alternatively, *746 petitioner claims that under section 162, the $ 2,500 payment was an ordinary and necessary expense of his investment banking or hydraulic oil pump trade or business. As discussed above, section 162 allows deduction of all ordinary and necessary expenses paid or incurred during a taxable year in carrying on a trade or business. We do not find that petitioner was in the trade or business of developing a hydraulic oil pump, i.e., that the hydraulic oil pump business was petitioner's business. Similarly, we do not find that petitioner was involved in the investment banking trade or business in his relationship with Johnson. His involvement with Jerry Johnson and TOPCO was as an investor. Accordingly, petitioner has not proven that the $ 2,500 paid to Johnson was an ordinary and necessary expense of carrying on a trade or business. Section 162 does not allow petitioner to deduct the $ 2,500 paid to Johnson. d. Section 165 Loss
*2139 Petitioner also argues that the money paid to Johnson is deductible under section 165 because of petitioner's employment as an investment banker. We believe that petitioner's employment as an investment banker is separate from his personal *747 investments and interests relating to TOPCO. As stated above, we have found that petitioner's involvement with Johnson was not related to a trade or business. Accordingly, this theory fails. e. Section 212
Finally, petitioner argues that the $ 2,500 is deductible under section 212. Petitioner's theory is that he wrote checks totaling $ 2,500 to Johnson to encourage him to support the TOPCO enterprise. Assuming this to be so, we would view these expenses as TOPCO corporate expenses. Johnson would ostensibly assist in providing income for TOPCO, not for petitioner. As a general rule, a shareholder taxpayer may not deduct expenses that would be corporate expenses, even though paid by the taxpayer. E.g., , affg. in part and revg. in part, ; ; ; ; , affd. per curiam ; ; *748 ; ; . Payments made with the purpose of keeping in business a corporation in which the taxpayer holds an interest are not deductible, unless the payments were ordinary and necessary expenses of his own trade or business. . Having rejected all of petitioner's theories, we hold that respondent's determination is sustained with respect to the $ 2,500 payment to Johnson. 3. Traveling Expenses
We also must decide whether petitioner's expenses for travel to Australia are deductible under either section 162 or section 212. a. Section 162
Section 162(a)(2) allows a deduction for ordinary and necessary expenses incurred during the taxable year in carrying on a trade or business, including traveling expenses (including amounts expended for meals and lodging other than amounts which are lavish or extravagant under the circumstances) while away from home in the pursuit of a trade or business. Cf. . *749 Respondent contends that petitioner's expenses are not deductible because they were related to a search for new business or investments. Petitioner contends that section 162 or section 212 is applicable because his expenses were part of his investment banking business. We agree with respondent. Expenses must have a reasonable and proximate relation to the production or collection of income. ; . We find the relation between the expenses claimed and the hoped-for production of income to be too remote. Petitioner had no business dealings in Australia prior to his 1981 trip. Petitioner's three-week trip to Australia was at the invitation of Tom Hopkins to investigate business opportunities. Petitioner testified that he was interested in AAGC in hopes of getting a disproportionate ownership interest in it if it became successful, and that the trip was to locate investment banking opportunities for Paine Webber or for himself. His employer, Paine Webber, did not ask petitioner to travel to Australia. Any expenses incurred on a trip made for Paine Webber *750 would have been reimbursed by Paine Webber. Petitioner testified that as a result of the Australia trip, Paine Webber underwriting was involved in a very minor item involving a small brokerage firm. However, petitioner did not provide any details or corroboration of the Paine Webber involvement. Petitioner testified that he has stayed in contact with several Australians and that he returned to Australia in 1989. He claims that his Australian contacts have produced some business deals. He said that he originated the concept of Pan American Corporation purchasing Northwest Airlines. He notified The Bank of New South Wales. The idea was to earn his present employer, Prudential Bache Capital Funding, an estimated $ 100 million in fees from an estimated $ 3.8 billion transaction. Petitioner attempted to tie his 1981 Australia trip to his work as an investment banker through a memento. However, the memento was not presented to petitioner by Northwest Airlines, Pan Am, or Paine Webber; it was merely a marketing device for a financial printer. Petitioner argued that his employment as an investment banker for Paine Webber was based on commissions. However, a review of the evidence *751 *2140 indicates that petitioner testified that higher ranking investment bankers are generally paid salaries and commissions. He did not testify how he was paid. At any rate, we do not find that petitioner's travels to Australia in 1981 were a part of an investment banking trade or business or any other trade or business. We believe it to be more of an attempt to locate personal investment opportunities or business ventures. Expenses incurred while exploring or investigating possible business ventures are not expenses paid or incurred in carrying on a trade or business under section 162(a)(2). ; ; , affd. per curiam ; . For example, expenses incurred while investigating and establishing new bank branches were held to be ineligible for section 162 treatment. . Expenses incurred *752 in anticipation of engaging in business in some future year are not deductible. ; ; ; , affd. without published opinion . Accordingly, we find that petitioner's travel expenses were incurred in anticipation of engaging in business in some future year and are therefore not deductible under section 162. b. Section 212
Alternatively, petitioner argues that his travel expenses are deductible under section 212. A proprietary or possessory interest in an income-producing asset is a prerequisite to the deductibility of related expenditures under section 212(1) or section 212(2). ; . Here, petitioner admitted that he had no income-producing assets in Australia when he made his trip in 1981. Accordingly, we hold that section 212 does not allow *753 petitioner to deduct his expenses. To reflect petitioner's concessions and the foregoing, Decision will be entered for the respondent.